# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| **TERRY DRAPER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:11cv1652 TCM** |
| | ) | |
| **CITY OF FESTUS, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM AND ORDER

The matter is before the Court[1] on Defendants' motion for summary judgment [Doc. 22]. Plaintiff filed a brief in opposition to the summary judgment motion, to which Defendants filed a reply. The parties also filed statements of fact and exhibits in support of their positions.

## Background

This lawsuit arises out of the 2011 termination of Terry Draper's (Plaintiff's) employment with Defendant City of Festus, Missouri ("City"), which was addressed during a public hearing before Defendant City Council of Festus ("Council") in June 2011. Defendants are City; Council; and eight individuals: City's Mayor, Michael Cage ("Mayor"); and Council's members: Timothy Montgomery, Gary Underwood, Paul Schaffer, Kathy

---

[1] Defendants removed the case from state court on the basis of this Court's federal question jurisdiction.

The matter is before the undersigned United States Magistrate Judge by written consent of the parties. See 28 U.S.C. § 636(c).

Murphy, Kevin Dennis, Bobby Venz, and Jim Tinnin (collectively, "Council Members"). Plaintiff is pursuing his claims against the individual Defendants in their individual and official capacities.

In Count I of his complaint, Plaintiff seeks a <u>de novo</u> hearing of the termination decision under Mo. Rev. Stat. § 536.150. (Pl.'s Compl. at 8-10 [Doc. 2].) As an alternative to Count I, in Count II Plaintiff asks the Court to review the administrative record and vacate the termination decision pursuant to Mo. Rev. Stat. § 536.100, on the ground that, upon the record as a whole, there is not substantial and competent evidence to support the termination and Defendants' actions were arbitrary and capricious, constituted an abuse of discretion, and violated Plaintiff's statutory and constitutional rights. (<u>Id.</u> at 10-14.) In both Counts I and II, Plaintiff requests reinstatement with full back pay plus an award of pre- and post-judgment interest, reasonable attorney's fees, and costs. (<u>Id.</u> at 10, 14.)

In addition to those Counts, Plaintiff alleges in Count III that the City is liable for breach of Plaintiff's three-year employment contract, and seeks an award of "all monies owed to him under the contract," including reasonable attorney's fees. (<u>Id.</u> at 14-15.) In Court IV, Plaintiff alleges the individual Defendants are jointly and severally liable for defamation, and seeks an award of compensatory damages and punitive damages, costs, and reasonable attorney's fees. (<u>Id.</u> at 15-17.) Plaintiff also seeks the same relief from all Defendants for their allegedly tortious interference with a business expectancy (Count V), for their alleged civil conspiracy (Count VI); and, under 42 U.S.C. § 1983, for their alleged violation of Plaintiff's substantive due process rights (Count VII). (<u>Id.</u> at 17-23.) In Count VIII, Plaintiff

alleges that the individual Defendants are liable under 42 U.S.C. § 1983 for a conspiracy to violate Plaintiff's civil rights; and seeks a monetary award to make him whole for all losses and damages, for his emotional pain and suffering, for punitive damages, for costs and for reasonable attorney's fees. (Id. at 23-26.) Finally, in Count IX, Plaintiff alleges all Defendants are liable for knowingly or purposely violating Missouri's Sunshine Law, Mo. Rev. Stat. § 610.021, entitling Plaintiff to a civil penalty, costs, and reasonable attorney's fees. (Id. at 26-27.) Plaintiff pursues Counts I and II in the alternative; and pursues Counts III, IV, V, VII, VIII, and IX "in the alternative to but without waiver of Counts I and II." (Id. at 14, 15, 17, 21, 23, and 26.)

Defendants deny liability and, through their pending motion for summary judgment, seek entry of judgment in their favor on each of Plaintiff's claims.

Based on review of Defendants' admissions in response to the allegations in Plaintiff's complaint, as well as the parties' admissions in response to each others' statement of facts regarding the pending summary judgment motion, and other uncontested evidentiary material submitted by the parties, the record reveals the following undisputed facts.

Plaintiff has worked in city administration for over 35 years, and was employed as City's City Administrator from August 2009 to July 2011. (Id. ¶¶ 2 and 9, as admitted by Defs. in their Answer [Doc. 5]; Defs.' Statement Facts ¶ 1 [Doc. 23], as admitted by Pl. [Doc. 25]; Pl.'s Statement Facts ¶ 168 [Doc. 25], as admitted by Defs. [Doc. 27].) Plaintiff has not been employed since City terminated him. (Pl.'s Statement Facts ¶ 169 [Doc. 25], as admitted by Defs. [Doc. 27].)

In October 2010, Defendants discussed a new contract with Plaintiff. (Pl.'s Compl. ¶ 11 [Doc. 2], as admitted by Defs. in their Answer [Doc. 5].) In their motion papers, the parties refer to that contract and there is no dispute regarding its existence, validity, or terms relating to termination. Plaintiff's three-year employment contract with City ("contract") was entered into on October 27, 2010. (Section 2C, Employment Agreement, dated Oct. 27, 2010, Ex. 1 attached to Compl. [Doc. 1 at 34-37].) Section 2A of the contract states that "[n]othing in this Agreement shall prevent, limit or otherwise interfere with the right of the Council to terminate the services of Employee at any time, subject only to the provisions set forth in Section 3 of this Agreement." (Id.) Section 3A sets forth the benefits to which Plaintiff is entitled if he is terminated. (Id. at 2.) In relevant part, Section 3A provides "that in the event Employee is terminated for 'just cause' as defined herein then City's only obligation to Employee is to pay to him all compensation accrued but unpaid at the date of termination." Id. Section 3C of the contract defines termination for just cause as "termination for any of the following reasons: (1) act(s) of misfeasance or malfeasance; or (b) act(s) constituting gross dereliction of duty; or (c) conviction of a crime involving moral turpitude." Id.

Plaintiff understood that, as City Administrator, he could authorize expenditures under $500.00; he needed to get three bids and have Council approval for purchases over $500.00; and a formal written proposal and bidding was required for purchases over $5,000.00. (Defs.' Statement Facts ¶¶ 74, 81 [Doc. 23], as admitted by Pl. [Doc. 25].)

Defendant Council is an administrative body, which, as of April 2011, included

individual Defendants Montgomery, Underwood, Schaffer, Murphy, Dennis, Venz, and Tinnin. (Pl.'s Compl. ¶¶ 4, 5, and 15 [Doc. 2], as admitted by Defs. in their Answer [Doc. 5].) Defendant Mayor is a voting member of Defendant Council only when there is a tie vote. (Pl.'s Compl. ¶ 5 [Doc. 2], as admitted by Defs. in their Answer [Doc. 5].)

From December 2010 through March 2011, Defendant Montgomery, who was not then a member of Defendant Council but was campaigning to become a Council member, attended certain Council meetings and challenged Plaintiff's decisions as City Administrator. (Pl.'s Compl. ¶ 12 [Doc. 2], as admitted by Defs. in their Answer [Doc. 5]; Defs.' Statement Facts ¶ 138 [Doc. 23], as admitted by Pl. [Doc. 25]; Pl.'s Statement Facts ¶ 175 [Doc. 25], as admitted by Defs. [Doc. 27].) Defendant Montgomery discussed issues regarding the emergency repair of Defendant City's heating, ventilation, and air conditioning (HVAC) system and the changing of an employee bonus program. (Pl. Compl. ¶ 14 [Doc. 2], as admitted by Defs. in their Answer [Doc. 5]; Defs.' Statement Facts ¶¶ 139, 141 [Doc. 23], as admitted by Pl. [Doc. 25]; Pl's Statement Facts ¶ 215 [Doc. 25], as admitted by Defs. [Doc. 27].)

Plaintiff alleges that Montgomery called him a liar at a Council meeting, either in open or closed session, on April 27, 2011. (Defs.' Statement Facts ¶ 76 [Doc. 23], as admitted by Pl. [Doc. 25]; Pl. Dep. at 41-43 and 45, Ex. C to Defs.' Statement Facts [Doc. 23-5].) No one else called Plaintiff a liar; no one ever told Plaintiff that any other Council member called him a liar; no one told Plaintiff they heard Montgomery or anyone else refer to Plaintiff as a liar or thief; and Plaintiff is not aware of any other Council member calling

him a thief. (Defs.' Statement Facts ¶ 77 [Doc. 23], as admitted by Pl. [Doc. 25]; Pl. Dep. at 41-45, Ex. C to Defs.' Statement Facts [Doc. 23-5].) Additionally, Plaintiff is not aware of anyone at Public Works or in the City who is conspiring with Montgomery. (Defs.' Statement Facts ¶ 102 [Doc. 23], as admitted by Pl. [Doc. 25].)

Alma Pat Parsons is a Certified Public Accountant who is City's Finance Director and has held that position since May 2005. (Defs.' Statement Facts ¶¶ 54 and 106 [Doc. 23], as admitted by Pl. [Doc. 25].) She does not recall ever hearing Montgomery using the word "lying" or suggesting that Plaintiff was being less than truthful. (Defs.' Statement Facts ¶ 110 [Doc. 23], as admitted by Pl. [Doc. 25].)

Plaintiff was advised he was suspended with pay as of May 2, 2011, and could appear or respond in writing at a Council hearing on May 4, 2011. (Defs.' Statement Facts ¶ 2 [Doc. 23], as admitted by Pl. [Doc. 25]; see also Pl.'s Compl. ¶ 19 [Doc. 2], as admitted by Defs. in their Answer [Doc. 5]; Ex. 5 attached to Pl.'s Compl. [Doc. 1 at 42-44].[2])

On May 2, 2011, Plaintiff received a letter from the City Attorney, Meagan Breeze. (Defs.' Statement Facts ¶ 78 [Doc. 23], as admitted by Pl. [Doc. 25].) By that letter, City notified Plaintiff of certain allegations against him. (Pl.'s Compl. ¶ 17 [Doc. 2], as admitted by Defs. in their Answer [Doc. 5]; Defs.' Statement Facts ¶ 3 [Doc. 23], as admitted by Pl.

---

[2] All references to exhibits attached to Plaintiff's complaint are references to the exhibits attached to the complaint that was provided with the notice of removal (and designated as Exhibit A to the notice of removal), or the exhibits attached to the complaint that is at Document 1. There are no exhibits attached to the complaint that was separately filed of record as Document 2. For convenience in locating the relevant exhibit, the Court will specify the pages of Document 1 at which the relevant exhibit may be found.

[Doc. 25]; see also Ex. 2 attached to Pl. Compl. [Doc. 1 at 2]; Ex. 5 attached to June 27,

2011, Hr'g Tr., Ex. A attached to Defs.' Statement Facts [Doc. 23-2 at 30-32].)  In particular,

Plaintiff was advised that he allegedly exceeded his authority in supervising employees,

making City purchases, and superseding actions of the Mayor and Council; may have

misappropriated City's money with respect to a hotel room for a Missouri Municipal League

(MML) conference; and may have inappropriately used City employees to move him into his

home in Festus.  (Letter to Pl. from Meagan Breeze, dated May 2, 2011, Ex. 2 attached to

Pl.'s Compl. [Doc. 1 at 38-39].)  More specifically, through that letter Plaintiff was advised

that he reportedly "approved a complete replacement of the heating and cooling systems at

Festus City Hall" at a cost of over $50,000 without seeking authorization from Council and

without requesting bids; sent a memorandum to "all full time employees stating that the

$300.00 sick leave bonus would no longer be paid," which "effectively repeal[ed]" an

ordinance regarding that bonus; and arranged for work at "the old high school shop building

[("the Stone Building")] on City Hall property without prior approval," including the

purchase of windows for that building.  (Id.)  The letter stated that Plaintiff could appear at

a hearing before the Council on May 4, 2011, to respond to the allegations orally or in

writing.  (Pl.'s Compl. ¶ 19 [Doc. 2], as admitted by Defs. in their Answer [Doc. 5]; Defs.'

Statement Facts ¶ 4 [Doc. 23], as admitted by Pl. [Doc. 25]; see also Ex. 2 attached to Pl.'s

Compl. [Doc. 1 at 38-39].)

On May 4, 2011, while Plaintiff did not discuss anything with Council, his attorney

presented Council with a written response to the allegations.  (Pl.'s Compl. ¶ 20 [Doc. 2], as

admitted by Defs. in their Answer [Doc. 5]; Defs.' Statement Facts ¶¶ 5 and 79 [Doc. 23], as admitted by Pl. [Doc. 25].) By that response, Plaintiff explicitly noted that he was not waiving his right to supplement the answers "and provide additional detail, documentation and other supporting information" and then stated, in relevant part, the following.

1) *Approved complete replacement of city hall heating and air conditioner units.*

An emergency situation existed per [a contracting company] that the threat of potential carbon monoxide poisoning in City Hall was a real concern due to the condition of the units.

Other City officials were aware of the emergency situation and were consulted in the decision.

The City Council was advised of the repairs at the next council meeting per city code.

The expense and work was all done per Emergency Repairs Provisions in city code.

2) *$300 sick leave bonus*

City employees became aware that a change to the sick leave bonus policy was being considered. Employees began inquiring as to whether they could count on the $300 bonus being paid at the end of 2011 per the existing policy. It was my understanding that the policy was going to be changed. Inquiries were made as to whether information regarding the proposed changes could be sent to the staff in writing. I believe a half sheet explaining the proposed change was sent to city employees.

Multiple meetings about this proposed change were held with . . . a Review Group and Supervision.

The half-sheet memo was an attempt to give courtesy notice to employees of the proposed changes to the bonus and was in no way an attempt to change the policy.

3) **Stone building rehab, AC Slab.**

    a. In early 2010 and continuing throughout that year and 2011, rehabbing the old building as an exercise room for city employees was brought to council's attention many times. This project was expected to be done a little at a time and the work was done quite slowly. Of the work done over nearly 18 months, the only major expense expected was window replacement. There were many ideas expressed about donations [from various sources]. Eventually, the lead project worker chose [one]. I was not involved in the actual purchase approval, but I was aware that windows were being purchased at the "least possible price." I found out later that the windows cost $1500.

    b. <u>Concrete slab around the AC units</u> - I was notified that part of the problem with our AC units was mowed grass being blown into the cooling vents from nearby grass lawn[s]. In order to prevent continual HVAC expenses, repairs and upkeep for many years to come, we chose to concrete the area to protect the units. Work was done by public works staff with city equipment. To my knowledge, the only purchases were concrete and bulk chipped wood for building adjacent dirt.

\*   \*   \*

**Additional Accusations Not Numbered**:

**A. MML hotel room charges.**

    The room was booked with my personal card to take advantage of a [hotel] discount.

    Upon check out, the room charges were placed on a city credit card I used when I checked in.

    Upon this discovery, the city's money was returned.

**B. City employees moving apartment goods to my new home –**

    My 2009 contract covered all moving expenses from Mascoutah, IL.

It required 3 bids from reputable movers and to select lowest bidder.

The 2010 contract repeated that same agreement. City Council was fully aware of difficulties in selling a home in the 2009/2010 market. The 2010-11 budget allowed $8,000 for my moving expenses. Part of the move included me moving from my apartment I had been renting while not being able to s[ell] my home. The move occurred in or around February 23, 2011. The vans used were large (approximately 18 wheelers). I asked the Mayflower foreman to leave room on one load or to add a trip to my apartment for those items once there. He explained that the truck would not fit, in his opinion.

It was agreed amongst several city employees that a few employees from public works would assist in order to save the City money. I did not anticipate that 6 employees would show up to assist, but that was not my decision. It is my recollection that the work was done in 1 hour and 15 minutes.

This was intelligent use of resources that saved the city money, but unfortunately is being used as a political issue.

(Pl.'s Response, Ex. 8 attached to Defs.' Statement Facts [Doc. 23-2 at 40-41]; Defs.' Statement Facts ¶ 91 [Doc. 23], as admitted by Pl. [Doc. 25].)

On May 4, 2011, Council voted to terminate Plaintiff's employment with City. (Pl.'s Compl. ¶ 109 [Doc. 2], as admitted by Defs. in their Answer [Doc. 5]; Defs.' Statement Facts ¶¶ 6, 79, and 103 [Doc. 23], as admitted by Pl. [Doc. 25].) Plaintiff learned through his attorney that he was terminated. (Defs.' Statement Facts ¶¶ 77, 79, 103 [Doc. 23], as admitted by Pl. [Doc. 25]; ) Mayor announced the decision to terminate Plaintiff to the public at or around 9:30 p.m. that night. (Pl.'s Statement Facts ¶ 184 [Doc. 25], as admitted by Defs. [Doc. 27].) An e-mail notice of Plaintiff's discharge was sent to Plaintiff's attorney

at 9:36 p.m. that evening.[3]  Breeze also sent Plaintiff's counsel a letter, dated May 6, 2011, advising that Plaintiff was discharged as a result of the May 4, 2011, meeting.  (Letter from Breeze to Pl.'s attorney, dated May 6, 2011, Ex. 6 at June 27, 2011 hearing.)

City's ordinances require City to provide a public hearing regarding the City Administrator's removal from office, when such a hearing is requested.  City Code Art. III Sec. 2-125; see also Pl.'s Compl. ¶ 29 [Doc. 2], as admitted by Defs. in their Answer [Doc. 5].  Plaintiff requested a public hearing regarding his termination.  (Pl.'s Compl. ¶ 24 [Doc. 2], as admitted by Defs. in their Answer [Doc. 5]; Defs.' Statement Facts ¶ 7 [Doc. 23], as admitted by Pl. [Doc. 25]; see also Ex. 3 attached to Pl. Compl. [Doc. 1 at 40].)

By letter, dated May 27, 2011, to Plaintiff's counsel, Ivan Schraeder, an attorney representing City with respect to Plaintiff's employment issues, advised Plaintiff that a public hearing was set for 1:00 p.m. on June 27, 2011.  (Pl.'s Compl. ¶ 29 [Doc. 2], as admitted by Defs. in their Answer [Doc. 5]; Defs.' Statement Facts ¶ 8 [Doc. 23], as admitted by Pl. [Doc. 25]; Pl.'s Statement Facts ¶ 185 [Doc. 25], as admitted by Defs. [Doc. 27].)  Plaintiff's attorney informed Schraeder, by letter dated June 2, 2011, that he had a conflict with that time and requested that the hearing be delayed by three hours, until 4:00 p.m. on June 27, 2011.  (Pl.'s Compl. ¶ 31 [Doc. 1-1], as admitted by Defs. in their Answer [Doc. 5]; Pl.'s Statement Facts ¶¶ 186 and 192 [Doc. 25], as admitted by Defs. [Doc. 27].)  Schraeder responded by letter, dated June 3, 2011, that the hearing could not be continued and that

[3] This is not disputed in the parties' briefs regarding the summary judgment motion.  See Pl.'s Opp'n Defs.' Mot. Summ. J. at 14 [Doc. 26]; Defs.' Reply Defs.' Mot. Summ. J. at 15 [Doc. 28].

Plaintiff had to request a continuance through the Mayor. (Pl.'s Compl. ¶ 32 [Doc. 2], as admitted by Defs. in their Answer [Doc. 5]; Pl.'s Statement Facts ¶ 187 [Doc. 25], as admitted by Defs. [Doc. 27].) That letter also advised that, at that hearing, Schraeder would represent City and Breeze would represent City Council. (Ex. 10 attached to Pl.'s Compl. [Doc. 1 at 52].)

Breeze sent Plaintiff a copy of the hearing procedures by correspondence dated June 8, 2011. (Pl. Compl. ¶ 34 [Doc. 2], as admitted by Defs. in their Answer [Doc. 5]; Pl.'s Statement Facts ¶ 190 [Doc. 25], as admitted by Defs. [Doc. 27].) Those procedures included provisions: that the mayor shall make procedural rulings during the hearing; that written notice of the date, time and place of the hearing shall be provided to the person requesting the hearing and posted in compliance with Missouri's Sunshine Law; that "the person requesting the hearing may be represented by counsel"; that the failure of the person requesting the hearing to appear at the hearing "shall constitute a waiver of the person's right to the hearing"; that "[a] court reporter will take a record of the hearing"; that "the technical rules of evidence do not apply during the hearing"; setting forth the order of presentation during the hearing, which in relevant part includes the presentation of each side's opening statement, if any, then the presentation of information by each side, "followed by cross-examination, if any," and the presentation of any rebuttal by the City. (Ex. 12 attached to Pl. Compl. [Doc. 1 at 56].) Those procedures also included a requirement that Council issue written findings of fact and a decision following the hearing. (Id. at 56-57.)

On June 27, 2011, at 1:00 p.m., a hearing regarding Plaintiff's termination was held

in the presence of Council members and the Mayor, and in the absence of Plaintiff and his attorney. (Pl.'s Compl. ¶ 35 [Doc. 2], as admitted by Defs. in their Answer [Doc. 5]; Pl.'s Statement Facts ¶ 191 [Doc. 25], as admitted by Defs. [Doc. 27]; see also Hr'g Tr., Ex. A attached to Defs.' Statement Facts [Doc. 23-1, 23-2, and 23-3].) Plaintiff did not appear at this hearing because his attorney had a conflict. (Defs.' Statement Facts ¶ 105 [Doc. 23], as admitted by Pl. [Doc. 25].) At that hearing, Schraeder presented argument, as well as twenty-five exhibits and sworn testimony by five witnesses, for Council's consideration. (Hr'g Tr., Ex. A attached to Defs.' Statement Facts [Doc. 23-1, 23-2, and 23-3].)

By a five-page Findings of Fact, Decision, and Order ("Decision"), dated July 20, 2011, Defendant Council affirmed the termination of Plaintiff's employment with City, and mailed the Decision to Plaintiff and his attorney on either July 20, 2011, or July 21, 2011. (Pl.'s Compl. ¶¶ 37, 38, and 39 [Doc. 2], as admitted by Defs. in their Answer [Doc. 5]; Defs.' Statement Facts ¶ 75 [Doc. 23], as admitted by Pl. [Doc. 25]; see also Council's Decision, Ex. 14 attached to Pl.'s Compl. [Doc. 1 at 59-63].) Specifically, Council's Decision noted that a City ordinance, City Code Art. III § 2-125, allows the termination of the City Administrator for "acts of dishonesty or acts of moral turpitude," and concluded Plaintiff was dishonest in certain respects of his work for the City. (Council's Decision, Ex. 14 attached to Pl.'s Compl. [Doc. 1 at 59-63].) In particular, Council made findings regarding Plaintiff's participation in: the process leading to Council's selection of an engineering firm ("selected firm") for the Sunshine Drive Project, after another individual's evaluation did not recommend that company for that project; the recommendation of the

selected firm to be City Engineer, after another person's evaluation did not recommend selection of that company for that position; approval of the purchase of the HVAC system for City Hall, without competitive bidding and based on a report that it was an emergency, when no emergency existed; the distribution of "a memo to City employees announcing that the sick leave bonus program was abolished," when Council had not abolished that program; the purchase of windows at a price of about $2,300 without bid; and the submission for reimbursement of hotel charges when the charges had been paid using City's credit card.[4] (Decision, dated July 20, 2011, Ex. 14 attached to Pl.'s Compl. [Doc. 1 at 59-63].) More specifically, Council concluded that there was sufficient evidence to find Plaintiff engaged in dishonesty when he:

> 1.  Processed the engineering firm for the Sunshine Drive Project and handled the selection process internally in the City which resulted in the recommendation of the engineering firm to the City Council.

> 2.  Processed the engineering firm and handled the selection process internally which resulted in the recommendation of the engineering firm to the city council for the City Engineer's work.

> 3.  Directed the purchase of the new HVAC system for City Hall without bidding the work and reported the actions as an "emergency" to the City Council.

> 4.  Reported to City employees that the Sick Leave Bonus program was abolished.

> 5.  Directed the purchase of the new windows for the Stone Building

---

[4]  In its Decision, Council did not find "dishonest" Plaintiff's use of City employees to move furniture from his apartment to his home. (Decision, dated July 20, 2011, Ex. 14 attached to Pl.'s Compl., at 5 [Doc. 1 at 63].)

without bidding the work as required under City policies and reported the actions to the City Council as $1500 instead of the $2300 that was the actual cost.

6. Submitted a request for hotel charge reimbursement on his personal credit card when the actual hotel charges were made on a City credit card.

(Decision, dated July 20, 2011, Ex. 14 attached to Pl.'s Compl., at 4 [Doc. 1 at 62].)

Sunshine Road Project. Bob Stephens, a former City employee who did engineering consulting for City's Public Works Department, evaluated engineering firms that responded to a request for proposals regarding City's Sunshine Road Project. (Defs.' Statement Facts ¶¶ 38 and 92 [Doc. 23], as admitted by Pl. [Doc. 25]; Pl.'s Statement Facts ¶ 230 [Doc. 25], as admitted by Defs. [Doc. 27].) Stephens did not evaluate the selected firm as one of the top firms for consideration. (Defs.' Statement Facts ¶¶ 38 and 92 [Doc. 23], as admitted by Pl. [Doc. 25]; Pl.'s Statement Facts ¶ 231 [Doc. 25], as admitted by Defs. [Doc. 27].) Stephens gave his evaluation to Bill Gray, City's Director of Planning and Public Works, who passed it along to Plaintiff without change. (Defs.' Statement Facts ¶ 39 [Doc. 23], as admitted by Pl. [Doc. 25].) Kristin Gendron,[5] then a management intern at City, participated in the creation of a spreadsheet regarding the selection of the Sunshine Road Project engineer. (Defs.' Statement Facts ¶ 41 [Doc. 23], as admitted by Pl. [Doc. 25]; Pl.'s Statement Facts ¶ 237 [Doc. 25], as admitted by Defs. [Doc. 27].) Plaintiff, who did not

_____

[5] This person's first name is reported by Defendants as "Christian" and by Plaintiff as "Kristin." (Compare Defs.' Statement Facts ¶ 41 [Doc. 23] with Pl.'s Statement Facts ¶ 237 [Doc. 25].) The Court identifies her as "Kristin Gendron" because she testified at the June 27, 2011, hearing before Council; and her first name is "Kristin" in the transcript of that hearing. (See June 27, 2011 Hr'g Tr., Ex. A attached to Defs.' Statement Facts [Doc. 23-1], at 2 and 18.)

think the criteria used by Stephens were valid or complete, added and deleted some criteria for the evaluation and recommended the selected firm. (Defs.' Statement Facts ¶ 94 [Doc. 23], as admitted by Pl. [Doc. 25]; Pl.'s Statement Facts ¶¶ 232, 233, and 234 [Doc. 25], as admitted by Defs. [Doc. 27].) By letter dated November 5, 2010, to the Missouri Department of Transportation, Plaintiff stated that

> on July 1, 2010, Bill Gray, Brent Abrams[,] Bob Stephens, and [Plaintiff] reviewed the submi[ssions] and considered the following firms[ u]nder procedures outline[d] in Missouri law, RSMo. Section 8.285 to 8.291 . . . . Based upon these criteria, it was determined that [the selected firm], having scored 24 out of 25, has the management, physical[,] and technical capabilities to render satisfactory service for the City.

(Defs.' Statement Facts ¶¶ 44 and 96 [Doc. 23], as admitted by Pl. [Doc. 25].)

Hiring City Engineer. After the selected firm was chosen for completion of the Sunshine Drive Project, City requested bids for companies to act as the general City Engineer. (Defs.' Statement Facts ¶ 44 [Doc. 23], as admitted by Pl. [Doc. 25]; Pl.'s Statement Facts ¶ 240 [Doc. 25], as admitted by Defs. [Doc. 27].) Plaintiff asked City's Public Works department to review submitted proposals, and emphasized that past performance should be taken into consideration. (Pl.'s Statement Facts ¶ 241 [Doc. 25], as admitted by Defs. [Doc. 27].) Gray evaluated the engineering firms seeking the position, and did not recommend the selected firm as one of the best choices. (Defs.' Statement Facts ¶ 45 [Doc. 23], as admitted by Pl. [Doc. 25].) After Gray provided Plaintiff with his evaluation, Plaintiff changed the criteria for evaluation of the firms, which caused the selected firm to be moved into a category of top firms eligible for selection. (Defs.'

Statement Facts ¶ 46 [Doc. 23], as admitted by Pl. [Doc. 25].)  Plaintiff recommended to Council that the selected firm be hired to serve as City's Engineer.  (Defs.' Statement Facts ¶ 47 [Doc. 23], as admitted by Pl. [Doc. 25]; Pl.'s Statement Facts ¶ 243 [Doc. 25], as admitted by Defs. [Doc. 27].)

HVAC Repair.  Plaintiff believed that an emergency HVAC replacement was needed for City Hall and received a written proposal from one company.  (Defs.' Statement Facts ¶¶ 48, 51, and 53 [Doc. 23], as admitted by Pl. [Doc. 25].)  Council voted to approve the emergency replacement of the system.  (Defs.' Statement Facts ¶ 124 [Doc. 23], as admitted by Pl. [Doc. 25].)  Plaintiff admits he told someone from the State of Missouri that the heating system was allowing carbon monoxide to come into the building, when he should have said that the heating system had the potential to allow carbon monoxide to come into the building.  (Defs.' Statement Facts ¶ 85 [Doc. 23], as admitted by Pl. [Doc. 25].)  Neither Montgomery nor Parsons think Plaintiff personally profited from the replacement of the HVAC system at City Hall; and Montgomery has no evidence making him think Plaintiff did anything financially inappropriate.  (Pl.'s Statement Facts ¶¶ 209-10 [Doc. 25], as admitted by Defs. [Doc. 27].)

Sick Leave Bonus.  Parsons or another City employee, Margaret Sago, told Plaintiff that City needed to notify the employees that there was going to be a change to the sick leave bonus.  (Pl.'s Statement Facts ¶ 211 [Doc. 25], as admitted by Defs. [Doc. 27].)  Plaintiff signed a memorandum drafted by a clerk at Parsons' recommendation regarding the abolishing of City employees' sick leave bonus.  (Defs.' Statement Facts ¶ 56 [Doc. 23], as

admitted by Pl. [Doc. 25].) The memorandum, dated March 2, 2011, was addressed to all full-time employees and stated that: "Effective January 1, 2011, the $300.00 Sick Leave Bonus will no longer be paid to City of Festus employees who have used no sick time between January 1st and December 31st of any given year." (Ex. 15 attached to June 27, 2011 Hr'g Tr. [Doc. 23-3 at 8].) The memo was either posted on bulletin boards or put with employee payroll checks. (Defs.' Statement Facts ¶ 118 [Doc. 23], as admitted by Pl. [Doc. 25].)

Stone Building Project. The Stone Building Rehab Project was a project to change a building behind City Hall to an exercise facility. (Defs.' Statement Facts ¶ 58 [Doc. 23], as admitted by Pl. [Doc. 25].) The renovation was a long process that took place over 18 months, and Mayor and Council were kept informed of its progress. (Pl.'s Statement Facts ¶ 217 [Doc. 25], as admitted by Defs. [Doc. 27].) Plaintiff authorized the purchase of windows for this building for a total of $2,269.96, without obtaining competitive bids or estimates. (Defs.' Statement Facts ¶¶ 59, 60, and 90 [Doc. 23], as admitted by Pl. [Doc. 25].) Plaintiff directed that the price be paid in two installments, one-half down and one-half "when done." (Defs.' Statement Facts ¶¶ 61 and 90 [Doc. 23], as admitted by Pl. [Doc. 25].)

MML Conference. In September 2010, City participated in an MML Conference, and approved obtaining a hotel room in the City of St. Charles for that conference. (Defs.' Statement Facts ¶ 64 [Doc. 23], as admitted by Pl. [Doc. 25].) Plaintiff made reservations at the hotel, claimed he put the charges on his personal credit card, and requested immediate payment. (Id.; Pl.'s Statement Facts ¶222 [Doc. 25], as admitted by Defs. [Doc. 27].)

Plaintiff received a check, dated August 26, 2010, issued by City to Plaintiff for a hotel room at the MML Conference from September 12, to September 15, 2010. (Defs.' Statement Facts ¶¶ 65, 66, 68, and 113 [Doc. 23], as admitted by Pl. [Doc. 25]; Ex. 25 attached to June 27, 2011, Hr'g. Tr. at Ex. A attached to Defs.' Statement Facts [Doc. 23-3 at 102-06].) Plaintiff then put the hotel bill on a city credit card, and returned the uncashed check to Mayor in October 2010 after the City's accounting department informed Mayor that the hotel bill had been paid by a City credit card and Mayor requested return of the check. (Defs.' Statement Facts ¶¶ 69, 70, 71, 113, 114 [Doc. 23], as admitted by Pl. [Doc. 25]; Pl.'s Statement Facts ¶¶ 223, 224, 226, and 227 [Doc. 25], as admitted by Defs. [Doc. 27].)

The only radio broadcast Plaintiff is aware of concerning his employment was the broadcast about the June 27, 2011 hearing. (Defs.' Statement Facts ¶ 104 [Doc. 23], as admitted by Pl. [Doc. 25].) Plaintiff "is not aware of any other broadcast on TV or radio on which [Plaintiff]'s performance was discussed, where it was reported that []he was called a liar or a thief." (Id.)

City was covered by liability insurance during the time encompassing the conduct challenged in this lawsuit. See policy issued by Missouri Intergovernmental Risk Management Association ("MIRMA"), Ex. K [Doc. 27-1].

After Council's Decision, Plaintiff filed this action in which there is pending Defendants' motion for summary judgment in their favor with respect to each of Plaintiff's claims.

## Discussion

Summary judgment standard.  Rule 56(a) of the Federal Rules of Civil Procedure mandates the entry of summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

**MidAmerican Pension and Emp. Benefits Plans Admin. Comm. v. Cox**, 720 F.3d 715, 718 (8th Cir. 2013); see also **Celotex Corp. v. Catrett**, 477 U.S. 317, 322 (1986) (discussing prior Rule 56(c), the predecessor to Rule 56(a) of the Federal Rules of Civil Procedure).

> The movant "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] ... which it believes demonstrate the absence of a genuine issue of material fact." Celotex[,] 477 U.S. [at] 323 . . . .  [The nonmovant then has the opportunity to identify specific portions of the record showing there is a genuine dispute of material fact.  See Fed. R. Civ. P. 56(c)(1).]  "On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.'" Ricci v. DeStefano, 129 S. Ct. 2658, 2677 (2009), quoting Scott v. Harris, 550 U.S. 372, 380 (2007) (internal quotations omitted).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 . . . (2000), quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 . . . (1986).  The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts," and must come forward with "specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 . . . (1986).  "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci, 129 S. Ct. at 2677, quoting Matsushita, 475 U.S. at 587.

**Torgerson v. City of Rochester**, 643 F.3d 1031, 1042-43 (8th Cir. 2011) (en banc) (first alteration in original).  The existence of a factual dispute is not enough alone to avoid entry

of summary judgment; "rather, the dispute must be outcome determinative under the applicable law." **Hammer v. City of Osage Beach, MO**, 318 F.3d 832, 837 (8th Cir. 2003) (citing <u>Anderson</u>, 477 U.S. at 248). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." **Othman v. City of Country Club Hills**, 671 F.3d 672, 675 (8th Cir. 2012) (citing <u>Anderson</u>, 477 U.S. at 248).

<u>Review of Council's Decision - Contested or Non-Contested Case (Counts I and II).</u> In Counts I and II, which are pursued in the alternative, Plaintiff asks the Court to review Council's Decision under the Missouri Administrative Procedure Act, either as a non-contested case under Mo. Rev. Stat. § 536.150 (Count I) or as a contested case under Mo. Rev. Stat. §§ 536.100 to 536.140 (Count II). Defendants seek summary judgment based on their position this is a contested case and review of the record before Council supports the affirmance of Plaintiff's termination. Plaintiff counters that this case should be treated as a non-contested case, entitling Plaintiff to <u>de novo</u> review by this Court; and, if it is considered as a contested case, then the Council's decision should be reversed because either there was insufficient evidence supporting that decision or the decision was arbitrary and capricious.

By City ordinance, the City must provide a public hearing to a City Administrator who is subject to removal from office, when a hearing is requested. City Code Art. III Sec. 2-125 (<u>see</u> Pl. Compl. ¶ 29 [Doc. 2], as admitted by Defs. in their Answer [Doc. 5]). In full, that ordinance states:

> The city administrator shall serve at the pleasure of the council. The

mayor, with the consent of a majority of the city council, may remove the city administrator from office at will, and such city administrator may also be removed by a vote of the city council independently of the mayor's approval or disapproval. A minimum of six (6) votes are necessary for such action. If requested, the mayor and city council shall grant the city administrator a public hearing within thirty (30) days following notice of such removal. During the interim, the mayor, with the approval of a majority of the city council, or by vote of the city council without the mayor's approval, may suspend the city administrator from duty, but shall continue his salary for two (2) calendar months following the final removal date; provided, however, that if the city administrator shall be removed for acts of dishonesty or acts of moral turpitude, such salary shall not be continued.

City Code Art. III Sec. 2-125; see also Mo. Rev. Stat. § 77.340 ("The mayor may, with the consent of a majority of all the members elected to the council, remove from office any appointive officer of the city at will; and any such appointive officer may be so removed by a two-thirds vote of all the members elected to the council, independently of the mayor's approval or recommendation"). It is undisputed that Plaintiff requested such a hearing, and Council held a hearing. The question is whether the matter should be reviewed by this Court as a contested case under Mo. Rev. Stat. §§ 536.100 to 536.140 or as a non-contested case under Mo. Rev. Stat. § 536.150.

Classification. "The classification of a case as 'contested' or 'non[-]contested' is determined as a matter of law." **City of Valley Park v. Armstrong**, 273 S.W.3d 504, 506 (Mo. 2009) (en banc) (per curiam). In both types of cases, the litigant is "entitled to challenge the governmental agency's decision" and "entitled to develop an evidentiary record in one forum or another." **Id.** at 506, 507 (internal quotation marks omitted) (quoting Furlong Cos. v. City of Kansas City, 189 S.W.3d 157, 165 (Mo. 2006) (en banc)). The key

-22-

to the classification is the hearing requirement.  **Id.** at 507.

"Non-contested cases do not require formal proceedings or hearings before the administrative body."  **Id.** at 506 (internal quotation marks omitted) (quoting Furlong Cos., 189 S.W.3d at 165).  Rather, the trial court engages in de novo review "hear[ing] evidence, determin[ing] facts, and adjudg[ing] the validity of the agency decision" in accordance with Mo. Rev. Stat. § 536.150.  **Id.**  (internal quotation marks omitted) (quoting Furlong Cos., 189 S.W.3d at 165).  This judicial proceeding "is similar to a judge-tried civil case."  **State ex rel. Koster v. Morningland of the Ozarks, LLC**, 384 S.W.3d 346, 350 (Mo. Ct. App. 2012).

"[I]n a contested case[, for which review is controlled by Mo. Rev. Stat. §§ 536.100 to 536.140,] the . . . litigant must try his or her case before the agency, and judicial review is on the record of that administrative trial."  **City of Valley Park**, 273 S.W.3d at 507.  The procedural formalities of the hearing before the governmental agency in a contested case include:

> notice of the issues ([Mo. Rev. Stat.] section 536.067); oral evidence taken upon oath or affirmation and the cross-examination of witnesses ([Mo. Rev. Stat.] section 536.070); the making of a record ([Mo. Rev. Stat.] section 536.070); adherence to evidentiary rules ( [Mo. Rev. Stat.] section 536.070); and written decisions including findings of fact and conclusions of law ([Mo. Rev. Stat.] section 536.090).

**City of Valley Park**, 273 S.W.3d at 507; accord **Sapp v. City of St. Louis**, 320 S.W.3d 159, 163 (Mo. Ct. App. 2010).

Having carefully considered the undisputed record, the Court concludes that this is

a contested case.  Plaintiff received pre-hearing notice of the issues that were going to be addressed at the hearing through, at least, the May 2, 2011 and May 6, 2011 letters he received from Breeze; as well as pre-hearing notice of the date and time of the hearing through the May 27, 2011 letter from Schraeder to Plaintiff's Counsel.  A record was made of the June 27, 2011, hearing before Mayor and eight Council members.  The transcript reveals that over twenty exhibits were admitted during the hearing and five witnesses provided sworn testimony, although there was no cross-examination.  See Hr'g Tr.  Then, within thirty days after the hearing, Council issued a unanimous written decision in favor of Plaintiff's termination.  See Council's Decision, dated July 20, 2011.  These aspects of the hearing satisfy the procedural requirements of a contested case as set forth in **City of Valley Park**, 273 S.W.3d at 507, and **Sapp**, 320 S.W.3d at 163.

Plaintiff contends this matter cannot be considered a contested case and should instead be considered a non-contested case because he was not present to cross-examine witnesses or otherwise present his positions.[6]  Plaintiff notes he was absent due to Defendants' failure to reschedule the hearing for the same day but three hours later than originally scheduled, as requested by Plaintiff within a few days of receiving notice of the hearing and approximately three weeks before the scheduled hearing date.

Defendants' denial of Plaintiff's request for a continuance of the hearing is not alone

---

[6]  Additionally, Plaintiff points out that the hearing procedures included a provision that his failure to appear at the scheduled hearing waived his right to a hearing.  The Court will not further consider this provision because a hearing was conducted and there is no indication of record that a waiver of the hearing occurred as a result of Plaintiff's absence from the hearing.

sufficient to change the characterization of this matter from a contested to a non-contested case. Plaintiff was provided about one month's notice of the hearing date and time, and the hearing was not scheduled at an unusual time. Plaintiff's request for a continuance did not explain the basis for Plaintiff's counsel's scheduling conflict, or that it could not be resolved in some manner so as to allow counsel to attend Plaintiff's hearing. Additionally, it is reasonable that the seven participating Council members and Mayor would prefer to maintain a 1:00 p.m. time for starting the public hearing due to the need to coordinate their schedules and provide sufficient time to complete the hearing. See, e.g., City's attorney's closing statement to Council at the June 27, 2011, hearing, Hr'g Tr. at 65 ("I appreciate that you've arranged your own personal schedules to attend a daytime meeting, which quite frankly, we scheduled to make sure we could complete it in one day because we didn't know how long it would take. But it is an important enough issue that we felt it should be dealt with quickly, efficiently and in one day's program"). Finally, there is no indication that, if Plaintiff or his counsel had been present, they would have been prevented from cross-examining witnesses, presenting objections, or presenting evidence and argument in support of Plaintiff's positions. To the contrary, the record indicates City's counsel had anticipated that he would not be the only person questioning witnesses. See id. at 6 (City's attorney observes that "we will present in a shorter fashion than originally anticipated because apparently, we will not have questions asked by anybody else"). Therefore, the Court is not persuaded that the denial of the requested continuance and Plaintiff's absence from the hearing transform this contested matter into a non-contested matter.

Because the Court concludes that this is a contested case, the Court will grant summary judgment in favor of Defendants on Count I, which sought review of the case as a "non-contested" case. The Court will proceed to review the matter as a contested case under Count II.

Review as a Contested Case. Plaintiff alleges that, upon reviewing this matter as a contested case, the Court should reverse Council's Decision because either there was insufficient evidence supporting the Decision or the Decision was arbitrary and capricious. See Mo. Rev. Stat. § 536.140.2. Defendants move for entry of summary judgment in their favor on the ground a review of the record before Council establishes that the Decision is supported by sufficient and substantial evidence and the Decision was not arbitrary and capricious.

After reviewing the record before the administrative body, the decision in a contested case may be upheld if it is supported by sufficient competent and substantial evidence, and is not contrary to the overwhelming weight of the evidence. See **Homa v. Carthage R-IX School Dist.**, 345 S.W.3d 266, 279 (Mo. Ct. App. 2011); **Lagud v. Kansas City MO Bd. of Police Comm'rs**, 272 S.W.3d 285, 290 (Mo. Ct. App. 2008). The decision must also not be unreasonable or arbitrary. Mo. Rev. Stat. § 536.140. An administrative body, such as Council, acts unreasonably and arbitrarily "if its findings are not based on substantial evidence in the record" or if it failed "to consider important aspects or factors regarding the issues." **Lewis v. City of University City**, 145 S.W.3d 25, 32-33 (Mo. Ct. App. 2004). "Substantial evidence is competent evidence that, if true, has a probative force on the issues,"

**id.** at 33, and "can aid the agency in deciding the case." **Lagud**, 272 S.W.3d at 292; **Homa**, 345 S.W.3d at 279.

When considering the record in a contested case, the reviewing court is bound by the administrative decision, even if there is evidence supporting a contrary conclusion, if the evidence warrants either of two opposite findings. **Lagud**, 272 S.W.3d at 291. Importantly, the agency has the "discretion to believe or disbelieve the evidence before it," to determine the "[c]redibility of witnesses and [to] weigh . . . [the] evidence." **Id.** at 292. Although the Court must defer to the administrative decision regarding factual matters, including determinations regarding the weight of the evidence and the credibility of the witnesses, the Court does not defer to the administrative decision regarding questions of law. **Homa**, 345 S.W.3d at 275-76; **Schnell v. Zobrist**, 323 S.W.3d 403, 409-10 (Mo. Ct. App. 2010).

A review of the record of the evidentiary hearing before Council indicates that twenty-five exhibits[7] were admitted. See June 27, 2011 Hr'g Tr. at 18, 45, and 52-53. The first eighteen exhibits were introduced after a brief summary of each of the exhibits by City's counsel. **Id.** at 10-18. The next seven exhibits were admitted during the presentation of testimony. Exhibit 1 is a compilation of Missouri statutory excerpts regarding purchasing;

---

[7] The hearing transcript lists twenty-six exhibits. See June 27, 2011 Hr'g Tr. at 3. The twenty-sixth exhibit, however, was not material introduced during the hearing for Council's consideration. Rather, that document was reported to be a proposed decision drafted by City's counsel and distributed to Council's members for their consideration in resolving the issues presented during the hearing; and is not available of record. See **id.** at 64-65. Therefore, the Court will only consider twenty-five documents as evidentiary documents presented to Council during the June 27, 2011 hearing.

exhibit two is a copy of the City Ordinance provisions for City Administrator, Art. III, § 2-120 through § 2-134; exhibit three is a three-page excerpt from the City Purchasing Policy Manual; and exhibit four is a copy of the Ordinance provisions for the Procurement Policy, Art. VII, § 2-333 through 2-248. The next thirteen exhibits include certifications that they are materials maintained in the custody of the City Clerk. Exhibit eighteen did not contain such a certification and was reported to be excerpts from the minutes of Council's January 12, 2011 meeting, "containing a narrative put together by the former city administrator explaining in his view how the HVAC system came to be replaced." See **id.** at 17. Each of exhibits nineteen through twenty-three also include a certification that the material was maintained in the City Clerk's custody. Exhibits twenty-four and twenty-five, which did not contain such certifications, were identified by City's Financial Director, Alma ("Pat") Parsons. **Id.** at 44, 48.

Two of the exhibits, exhibits nineteen and twenty-three, will not be considered by the Court. The version of exhibit nineteen available of record does not reflect the information to which the witness Robert Stephens testified, and, instead, appears to be an incomplete or incorrect copy of Stephens' spreadsheet reporting his evaluation of engineering firms seeking to work on City's Sunshine Drive Project. See the available copy of Ex. 19 from the June 27, 2011 Hr'g. Exhibit twenty-three was listed as a "Requisition and Purchase Order" for windows but appears to be only the minutes of Council's December 22, 2010 meeting.[8]

---

[8] A copy of what appears to be an invoice for the purchase of the windows is provided as Defs.' Ex. I, attached to Defs.' Statement Facts [Doc. 23-11].

The five witnesses at the hearing testified as follows. Stephens stated he had been a City employee and, during the relevant time, was a consultant for City with respect to engineering, project engineering, and project development. June 27, 2011 Hr'g Tr. at 23-24. He evaluated engineering company materials for the Sunshine Drive Project, recommending the selected firm as the number three choice. **Id.** at 25. He gave his evaluation and recommendation to Bill Gray, City's Director of Planning and Public Works. **Id.** at 25. Gray passed Stephens' evaluation on to Plaintiff without change. **Id.** at 28.

Gendron was a management college intern during the relevant time (and, by the time of the hearing, was an assistant to the-then City Administrator). See June 27, 2011 Hr'g Tr. at 18. She worked with Plaintiff on the hiring of an engineering company to work on the Sunshine Drive Project. **Id.** Plaintiff ordered her "to basically rate all of the engineering firms from one to five and to make sure that [the selected firm] came out in first place." **Id.** at 19. She then created a "Consultant Rating Sheet," Ex. 19 at 5, with random numbers used to calculate the evaluation of each firm and changed her original numbers per Plaintiff's instruction. June 27, 2011, Hr'g Tr. at 21-22. The document was sent to the Missouri Department of Transportation, and those criteria were used by City to choose the selected engineering firm to do the construction phase of the Sunshine Drive Project. **Id.** at 22.

In City's effort to select an engineering company as City's engineer, Gray created a list of the bidding engineering companies and their qualifications, marking them from 1 to 5, with 5 being the highest. **Id.** at 29. Of the thirteen firms, six received a "5" and the

selected firm received a "4." **Id.** at 30. To his knowledge none of his top six firms were interviewed for the position. **Id.**

Gray stated he was present when Plaintiff and other City employees moved Plaintiff's belongings from his apartment to his home. **Id.** at 32. At that time, about five City employees helped Plaintiff move his belongings during the late morning or early afternoon of a workday. **Id.**

Michelle Guidicy, City's Financial Administrative Assistant, discussed the HVAC replacement with Plaintiff and Parsons, City's Financial Director. **Id.** at 33-34. While she testified she did not recommend the purchase as an emergency, she also testified that she "thought it was an emergency due to pictures" of the HVAC that she saw. **Id.** at 34-35. She agreed with making the purchase, but recommended to Plaintiff that bids be received due to the project's cost. **Id.** at 34-35. She did not want to spend $6,000 on a HVAC repair, because she thought the repaired HVAC would be torn out and replaced. **Id.** at 35. She prepared the purchase order for the more than $50,000 purchase. Ex. 22 at 3.

Parsons testified that she talked with Guidicy and Plaintiff about the HVAC and told Plaintiff she did not think the HVAC purchase complied with City's purchasing policies, but Plaintiff said it fell under the emergency guidelines. **Id.** at 41-42. When she advised Plaintiff that it exceeded the maintenance budget and there was no money to move over to pay it, Plaintiff said he'd get Council approval and deal with getting the funds later. **Id.** at 43. After Council approved the expenditure, Parsons prepared the required materials for

making the payment.  **Id.** at 43-44.

In her position as City's Financial Director, Parsons oversees employees' expenses. **Id.** at 45.  In August 2010 Plaintiff submitted a request for a check to reimburse him for a credit card charge he made to reserve a hotel room to attend the Missouri Municipal League convention being held in mid-September.  **Id.**; Ex. 25.  She responded that his credit card would not be charged until after the hotel stay, at which time he could submit a receipt and they would seek a sales tax rebate. June 27, 2011, Hr'g Tr. at 47-48.  He responded that they "were too busy to mess with that" and he wanted reimbursement "now." **Id.**  She wrote out a check, which was voided in October after she learned that Plaintiff's hotel stay was charged to City's credit card.  **Id.** at 45, 49.

As City's Financial Director, Parsons was also familiar with the purchase of windows for the Stone Building.  **Id.** at 49.  To her knowledge, no bids were requested for that project. **Id.**

One of the exhibits admitted during the hearing is the letter Breeze sent Plaintiff's counsel after Council's May 4, 2011 hearing that resulted in the termination of Plaintiff.  See Letter from Breeze to Plaintiff's counsel, dated May 6, 2011, Ex. 6 at June 27, 2011 hearing. That letter states the vote, which was made in closed executive session, was unanimous, and was followed by opening the Council's meeting to the public when, at approximately 9:30 p.m., Mayor announced that Plaintiff was no longer employed by City and "it was a personnel matter upon which [Mayor] would not comment." **Id.**  Breeze's May 6th letter

further reported that Plaintiff "was discharged due to the concerns outlined in the May 2, 2011 letter, as well as a dispute about the bid process for a city engineer," during which process Plaintiff "ordered city staff to manipulate the responsive bid data so [the selected firm] would be awarded the bid." Id. In her May 6th letter, Breeze indicated there were concerns that this behavior, as well as the incidents outlined in her earlier letter, "would subject the City to additional and unnecessary litigation risk" and were violations of City's Code, constituting just cause for Plaintiff's termination. **Id.**

Within thirty days after the hearing, Council issued its decision upholding Plaintiff's termination on the grounds that Plaintiff was dishonest in certain respects of his work for the City. (Council's Decision, Ex. 14 attached to Pl.'s Compl. [Doc. 1 at 59-63].) In particular, Council made findings regarding Plaintiff's participation in: the process leading to Council's decision to hire the selected firm for the Sunshine Drive Project, after another individual's evaluation did not recommend that company for that project; the recommendation of the selected firm to be City Engineer, after another person's evaluation did not recommend selection of that company for that position; approval of the purchase of the HVAC system for City Hall, without competitive bidding and based on a report that it was an emergency, when no emergency existed; the distribution of "a memo [signed by Plaintiff] to City employees announcing that the sick leave bonus program was abolished," when Council had not abolished that program; the purchase of windows at a price of $2,300 without bid; and the submission for reimbursement of hotel charges when the charges had been paid using

City's credit card.[9]  (Decision, dated July 20, 2011, Ex. 14 attached to Pl.'s Compl. [Doc. 1 at 59-63].)  More specifically, Council concluded that there was sufficient evidence to find Plaintiff

> engaged in dishonesty when he:
>
> 1.  Processed the engineering firm for the Sunshine Drive Project and handled the selection process internally in the City which resulted in the recommendation of the engineering firm to the City Council.
>
> 2.  Processed the engineering firm and handled the selection process internally which resulted in the recommendation of the engineering firm to the city council for the City Engineer's work.
>
> 3.  Directed the purchase of the new HVAC system for City Hall without bidding the work and reported the actions as an "emergency" to the City Council.
>
> 4.  Reported to City employees that the Sick Leave Bonus program was abolished.
>
> 5.  Directed the purchase of the new windows for the Stone Building without bidding the work required under City policies and reported the actions to the City Council as $1500 instead of the $2300 that was the actual cost.
>
> 6.  Submitted a request for hotel charge reimbursement on his personal credit card when the actual hotel charges were made on a City credit card.

(Decision, dated July 20, 2011, Ex. 14 attached to Pl.'s Compl., at 4 [Doc. 1 at 62].)

These findings, as well as the conclusion upholding Plaintiff's termination, are supported by the record, including the numerous exhibits introduced at the hearing.

Plaintiff urges that there is insufficient evidence to support the decision, and the

---

[9]  In the Decision, Council did not find "dishonest" Plaintiff's use of City employees to move furniture from his apartment to his home. (Decision, dated July 20, 2011, Ex. 14 attached to Pl.'s Compl., at 5 [Doc. 1 at 63].)

decision is arbitrary and capricious. Then Plaintiff proceeds to address each basis for the decision and set forth, based on evidence now before this Court, why the decision as to each of those bases is incorrect. That is not how this Court may review the contested decision of Council. Rather the Court must review only the record before Council. Based on that review, the Court concludes Council's decision to terminate Plaintiff is supported by substantial evidence and is not arbitrary and capricious.

Finding no genuine dispute of material fact and no question of law to preclude entry of summary judgment in favor of Defendants on review of the termination of Plaintiff as a contested case, the Court will grant Defendants' motion for summary judgment with respect to Count II.

Breach of the Employment Agreement (Count III).      In Count III, Plaintiff alleges that Defendant City breached Plaintiff's employment contract, and seeks monetary relief for that breach. In seeking summary judgment in its favor on this Count, City points out that the contract gives City the right to terminate Plaintiff either at any time for any reason, with payment of "six months aggregate salary and benefits"; or upon "just cause," with payment of all compensation accrued but unpaid as of the date of his termination. See Section 3A of Plaintiff's employment contract. City points out that City paid Plaintiff through the date his termination was affirmed by Council; that "just cause" is contractually defined as "[a]ct(s) of misfeasance or malfeasance; or (b) act(s) constituting gross dereliction of duty . . . ," **id.** at Section 3A(c); that it is clear that Plaintiff was terminated "for acts of misfeasance, malfeasance and gross dereliction of duty" and, therefore, his termination falls within the

-34-

contractual requirements allowing his termination.

Plaintiff counters that "evidence of Plaintiff's alleged 'misfeasance,' 'malfeasance,' or 'gross dereliction of duty' is disputed in this case."  In support of this argument, Plaintiff states in full:

> The evidence shows that [Plaintiff]'s performance as Festus' city administrator beca[m]e a campaign issue for one council member in particular - Tim Montgomery - and although all of the acts that . . . allegedly supported [Plaintiff]'s termination were known to the Council well before the election in April 2011; . . . [Plaintiff]'s termination or alleged misconduct was not even discussed until the new council was sworn into office in mid-April 2011. [Plaintiff] received the letter outlining his alleged misconduct less than two weeks after the new Council was sworn in.  Prior to the new Council being sworn in, [Plaintiff] had received very high marks on his evaluation and had just signed a . . . three-year contract.

(Pl. Mem. Opposing Def.s' Mot. for Summ. J. at 8 [Doc. 26 at 8].)  Plaintiff correctly points out that City is not arguing either that Plaintiff has failed to state a breach of contract claim or that Plaintiff did not have a valid contract.  Id.

A breach of contract action in Missouri has the following essential elements:  "(1) the existence and terms of a contract; (2) that [the party claiming the breach] performed or tendered performance pursuant to the contract; (3) breach of the contract by the [opposing party]; and (4) damages suffered by the [party claiming the breach]."  **Keveney v. Missouri Military Acad.**, 304 S.W.3d 98, 104 (Mo. 2010) (en banc).  Under Missouri law, "a court must enforce a contract 'as written and according to the plain meaning of the words in the contract when the contract is clear and unambiguous.'"  **Dubinsky v. Mermart, LLC**, 595 F.3d 812, 816 (8th Cir. 2010) (construing Missouri law) (quoting Contract Freighters, Inc.

v. J.B. Hunt Transp., Inc., 245 F.3d 660, 663 (8th Cir. 2001)).   Canons of contract construction include "[c]hief among [them] that the court first looks to the plain language of the agreement.  If that language clearly addresses the matter at issue, the inquiry ends." **TAP Pharm. Prods., Inc. v. State Bd. of Pharmacy**, 238 S.W.3d 140, 143 (Mo. 2007) (en banc) (citation omitted).

Here, there is no dispute that an employment contract between City and Plaintiff existed at the time of Plaintiff's termination and provided, in relevant part, for the termination of Plaintiff for "just cause."  The issue for Plaintiff's breach of contract claim is whether there is a genuine issue of material fact that "just cause" supports Plaintiff's termination; and, if not, does the undisputed record support entry of judgment in favor of City on that claim.

The contract defines "just cause" as "misfeasance," "malfeasance," or a "gross dereliction of duty," but does not define those terms.  Misfeasance is the performance of a lawful action in a wrongful  manner.  Black's Law Dictionary 1090 (9th ed. 2009). Malfeasance is a wrongful or unlawful act.  Id.  at 1042. Dereliction is the abandonment of a legal obligation.  Id. at 508.

The undisputed record discloses that Plaintiff engaged in such conduct.  For instance, Plaintiff signed a memorandum, dated in March 2011, that was posted and distributed to City's employees indicating an annual sick leave bonus was eliminated as of January 1, 2011, when there had been no official decision to eliminate that bonus.  Additionally, the undisputed record demonstrates that, on two occasions, Plaintiff approved work involving amounts over $500 without submitting the work to the usual bidding process.  This conduct

by Plaintiff constitutes misfeasance and, therefore, supports the termination of his employment under his contract with City.

Plaintiff's contention that the timing of the termination decision raises issues preventing entry of summary judgment in favor of City on the breach of contract claim is not persuasive. Plaintiff is correct that the termination decision came shortly after Montgomery became a Council member; and that the decision was based, in large part, on Plaintiff's conduct occurring in 2010 and early 2011 before Montgomery was a Council member. Yet, the timing of the circumstances does not raise a genuine dispute of material fact about whether or not Plaintiff engaged in conduct constituting misfeasance and whether such conduct supports his termination.

Having considered the undisputed record, Plaintiff's conduct in approving and seeking payment for the purchase of windows and HVAC equipment without bidding, and distributing to employees a memorandum announcing the elimination of the annual sick leave bonus before an official decision to eliminate that bonus, falls within the contractual definition of "just cause" supporting his termination. The purported dispute about the timing of Plaintiff's discharge, under the circumstances here, is not material to a decision on Plaintiff's breach of contract claim so as to prevent the entry of summary judgment in favor of City.

Summary judgment in favor of City will be entered with respect to the breach of contract claim in Count III of Plaintiff's complaint.

<u>Defamation (Count IV).</u> In Count IV, Plaintiff alleges that all individual Defendants

are jointly and severally liable for certain defamatory statements that Plaintiff "was dishonest, a liar and a thief" that were allegedly made by Montgomery, and either made or adopted by the other Council members, during public Council meetings, and then reported in news publications, between April 2011 and July 2011. (Pl.'s Compl. ¶¶ 63-66 [Doc. 2 at 21].)

The individual Defendants seek entry of summary judgment in their favor on this claim because any such statement by Montgomery was not a statement of fact but an opinion, which is not actionable; and because any such statement was privileged under the First Amendment in that it was made in a public hearing regarding a public official's performance of his duties.

The parties agree that to make a submissible case of defamation in Missouri, a plaintiff must establish "(1) publication, (2) of a defamatory statement, (3) which identifies the plaintiff, (4) that is false, (5) that is published with a reckless degree of fault and (6) [that] damages the Plaintiff's reputation." **Sterling v. Rust Commc'ns**, 113 S.W.3d 279, 281 (Mo. Ct. App. 2003) (citing Nazeri v. Missouri Valley Coll., 860 S.W.2d 303 (Mo. 1993) (en banc)). "Whether language is defamatory and actionable is a question of law." **Id.** To decide "whether, as a matter of law, an allegedly defamatory statement is reasonably capable of a defamatory meaning," the allegedly defamatory words must "'be stripped of any pleaded innuendo . . . and construed in their most innocent sense" and then the words 'must be considered in context, giving them their plain and ordinarily understood meaning.'" **Id.** at 282 (citations omitted) (quoting Nazeri, 860 S.W.2d at 311). If the statements are capable

of a defamatory meaning, the court then inquires "if one or more privileges would shelter the defendant from legal action." **Id.** at 281.

> These privileges offered by the First Amendment to the United States Constitution include the absolute privilege accorded statements of opinion, which even if made maliciously or insincerely, do not give rise to a [defamation] cause of action. The determination of whether a statement is a pure opinion or an assertion of fact is a question of law. The court must examine the totality of the circumstances to determine whether the ordinary [person] would have treated the statement as opinion.

**Id.** at 281-82 (citations omitted); accord **Hammer**, 318 F.3d at 842-43 (affirming the grant of summary judgment in favor of a city's mayor on a defamation claim pursued against that mayor and the city by a terminated city manager).

Because there is a genuine dispute of material fact regarding whether or not Plaintiff was ever publicly called a "liar" or "thief" by Montgomery or any other Defendant, and because the record does not clearly disclose the context and circumstances of any such statement, the Court cannot grant summary judgment on this Count. In Plaintiff's statement of material facts regarding Defendants' motion for summary judgment, Plaintiff avers only that Defendant Montgomery called Plaintiff a "liar" and a "thief" at public Council hearings before and after his election to Council. (Pl.'s Statem. Facts ¶¶ 179-182 [Doc. 25 at 23].) Plaintiff supports these averments with citations to his testimony at pages 40-42 of his deposition. (Id.; see Pl.'s Dep. at 40-42, Ex. C attached to Defs.' Statem. Facts [Doc. 23-5 at 63-65].) In response, Defendants deny that Montgomery "ever call[ed Plaintiff] either a liar or a thief." (Defs.' Response to Pl.'s Statem. Facts ¶¶ 179-82 [Doc. 27 at 2].)

In his deposition Plaintiff testified that only Montgomery called him a "liar" and

"thief," and that those words were used in open or public sessions of Council meetings before and after Montgomery was elected to Council. (Pl.'s Dep. at 41-46, Ex. A to Pl.'s Response to Defs.' Mot. Summary J. [Doc. 25-1 at 41-46]; Pl.'s Dep. at 40-45, Ex. C attached to Defs.' Statem. Facts [Doc. 23-5 at 3-8].) Plaintiff did not recall exactly when these alleged statements were made; and nothing describes the context or circumstances of those alleged statements. Plaintiff further testified that he had not heard anyone else call him a "liar" or a "thief." (Id. at 41, 44, 44-45.) Montgomery, in his deposition, denied calling Plaintiff a "liar" and denied accusing Plaintiff "of not telling the truth" during a Council meeting after he was elected to Council. (Montgomery Dep. at 159, Ex. F to Defs.' Mot. Summ. J. [Doc. 23-8].)

Because a genuine dispute exists about whether or not Montgomery stated publicly that Plaintiff was a "liar" or a "thief," and because the context of and circumstances surrounding any such statement are not available of record, the Court is unable to determine whether any such statement occurred and, if so, whether any such statement is defamatory and actionable or privileged as opinion and not actionable. Therefore, the motion for summary judgment will be denied as to the defamation claim in Count IV.

Tortious Interference with Business Expectancy (Count V). In Count V, Plaintiff alleges all Defendants are liable due to Plaintiff's allegedly "valid business expectancy in his continued employment, absent cause for his discharge after a public hearing." (Pl.'s Compl. ¶¶ 75 [Doc. 2].) Specifically, Plaintiff alleges that Defendants intentionally and "without justification" participated "in the hearing in the absence of Plaintiff . . . and [in the decision

to] terminat[e] Plaintiff's employment" and "used improper means" "in bad faith and with malice" by "making defamatory public statements about Plaintiff and stating and/or implying that Plaintiff was and is a liar and a thief."  (Id. ¶¶ 77, 78, 80.)

Defendants request entry of summary judgment in their favor on Plaintiff's tortious interference claim because a municipality and its officials have sovereign immunity from common law tort actions for conduct that falls within the municipality's governmental function, such as terminating a city employee; this claim may not be pursued against City because it is a party to Plaintiff's employment contract; this claim may not be pursued against the individual Defendants because they are "persons who represent the City" and so they are "in essence, . . . parties to the contract"; and Plaintiff cannot recover on this claim because Defendants were justified in terminating Plaintiff's employment.  In response, Plaintiff argues that Defendants waived their sovereign immunity by purchasing insurance covering this claim.

To establish a tortious interference with business expectancy claim, Plaintiff must demonstrate "(1) a contract or valid business expectancy; (2) defendant's knowledge of the contract or relationship; (3) a breach induced or caused by defendant's intentional interference; (4) absence of justification; and (5) damages."  **Rice v. Hodapp**, 919 S.W.2d 240, 245 (Mo. 1996) (en banc).  "'[W]hen a contract alone creates a business expectancy, [a] plaintiff cannot bring a claim for interference with a business expectancy against a party to that contract.'"  **Cole v. Homier Distributing Co.**, 599 F.3d 856, 861 (8th Cir. 2010) (construing Missouri law) (quoting BMK Corp. v. Clayton Corp., 226 S.W.3d 179, 191 (Mo.

Ct. App. 2007)). Therefore, Plaintiff may not pursue his tortious interference with business expectancy claim against City, with whom Plaintiff had an employment contract, in this case arising out of Plaintiff's discharge. The following discussion of sovereign immunity applies to City to the extent Plaintiff must instead be considered an at will employee of City, subject to dismissal for no reason. See **Hammer**, 318 F.3d at 842 (citing Fidler v. Personnel Comm. for the City of Raytown, 766 S.W.2d 158, 160 (Mo. Ct. App. 1989), for stating a municipality has no authority to limit by contract or ordinance the municipality's authority under Mo. Rev. Stat. § 79.240 to hire and discharge at will its appointed officers).

To the extent this claim is pursued against Council and the individual Defendants sued in their official capacities, sovereign immunity supports entry of summary judgment in their favor. A municipality has sovereign or governmental immunity from common law tort actions arising out of conduct undertaken as part of the municipality's governmental functions. **Southers v. City of Farmington**, 263 S.W.3d 603, 609 (Mo. 2008) (en banc). Sovereign immunity also bars suits against governmental employees sued in their official capacity, as those "are essentially direct claims against" the government. **Betts-Lucas v. Hartmann**, 87 S.W.3d 310, 327 (Mo. Ct. App. 2002). The Missouri Supreme Court has "held that termination of a city employee is a governmental function" and, therefore, sovereign immunity protects against tort claims arising out of the discharge of a municipality's employee, unless an exception to that immunity applies. **Kunzie v. City of Olivette**, 184 S.W.3d 570, 574 (Mo. 2006) (en banc).

An exception to a city's sovereign immunity exists to the extent of a city's liability

insurance coverage.  **Id.**; Mo. Rev. Stat. § 71.185 (pertaining to municipalities); see also Mo. Rev. Stat. § 537.610 (sovereign immunity for a state's political subdivisions).  The insurance policy at issue here expressly provides that its coverage "does not apply to any claim or lawsuit which is barred by the doctrine[] of sovereign immunity . . . ."  (Section F, "Sovereign Immunity," of Defs.' Liability Insurance Policy issued by MIRMA, Ex. K, at I-4 [Doc. 27-1].)   This policy language, which disclaims coverage of any claim barred by sovereign immunity, avoids a waiver of sovereign immunity for such a claim.  **State ex rel. Bd. of Trs. of North Kansas City Mem'l Hosp. v. Russell**, 843 S.W.2d 353, 360 (Mo. 1992) (en banc); accord **Hammer**, 318 F.3d at 841-42 (construing Missouri law in a case involving a former city administrator's claims arising out of his discharge); **Conway v. St. Louis County**, 254 S.W.3d 159, 167 (Mo. Ct. App. 2008) (construing nearly identical language in a MIRMA policy).  Because Plaintiff's tortious interference claim is a tort claim subject to sovereign immunity, and Defendants' liability policy does not cover that claim, sovereign immunity protects Council and the individual defendants, sued in their official capacities, from that claim.

To the extent Plaintiff is also suing the individual Defendants in their individual capacities in this Count, public officials are protected by official immunity from liability for alleged acts of negligence related to the performance of discretionary acts or omissions occurring in the course of official duties.  **Southers**, 263 S.W.3d at 610; see also **B.A.B., Jr. v. Board of Educ. of City of St. Louis**, 698 F.3d 1037, 1042 (8th Cir. 2012) (construing

Missouri law and noting that a nurse defendant "would be subject to the individual capacity defense[] of official . . . immunity as a matter of law" if she had been sued in her individual capacity with respect to a negligent supervision claim; and concluding that Southers, supra, did not eliminate the distinction between official capacity and individual capacity). "Official immunity is intended to provide protection for individual government actors who, despite limited resources and imperfect information, must exercise judgment in the performance of their duties." **Southers**, 263 S.W.3d at 611. The determination of whether an act or omission is discretionary is made on a case-by-case basis, and requires consideration of the nature of the public employee's duties, the extent to which the act or omission involves policymaking or the exercise of professional judgment, and the consequences of not applying official immunity. **Id.** at 610. Having considered these factors, the Court concludes that any challenged omissions or acts by these Defendants in the course of considering and then deciding to discharge Plaintiff are discretionary; and are therefore subject to the protection of official immunity.

Where a public employee acts with malice or bad faith, however, official immunity provides no protection. See, e.g., **Schmidt v. City of Bella Villa**, 557 F.3d 564, 575 (8th Cir. 2009) (construing Missouri law) (citing State ex rel. Twiehaus v. Adolf, 706 S.W.2d 443, 446 (Mo. 1986) (en banc)). While Plaintiff alleges in his complaint that Defendants acted with malice and bad faith with respect to this tortious interference claim, Plaintiff did not specifically respond to the summary judgment motion with evidence or references to the record showing any such bad faith or malice. Accordingly, official immunity is applicable.

Cf. **id.** (concluding that summary judgment in favor of a city employee on the ground of official immunity was appropriate, and rejecting the plaintiff's argument that the defendant was not entitled to official immunity because he was motivated by bad faith or malice, where the plaintiff relied on "innuendo regarding [the defendant]'s mindset" and "speculation and conjecture about [the defendant's] ulterior motive" to establish the bad faith or malice).

Having found no genuine dispute of material fact and that the individual Defendants are entitled to entry of summary judgment in their favor with respect to Plaintiff's tortious interference claim, the Court will grant Defendants' motion for summary judgment on Count V.

For the civil conspiracy claim in Count VI.  For his civil conspiracy claim, Plaintiff alleges that Defendants entered into an agreement or understanding "to tortiously interfere with Plaintiff's valid business expectancy, and/or to defame Plaintiff as part of a broader conspiracy to embarrass Plaintiff and deprive him of the public hearing that he requested." (Pl.'s Compl. ¶ 84. )  Additionally, Plaintiff alleges, Defendants had "an unlawful objective to commit the unlawful acts . . . in an effort to fire . . . Plaintiff and/or to interfere with Plaintiff's contract with the City and his protected property interest in his employment." (Id. ¶ 85.)  Defendants allegedly engaged in the

> following overt acts in furtherance of their conspiracy: They published
> defamatory comments that Plaintiff was a thief and a liar, they refused to
> postpone the hearing the Plaintiff requested by three hours so that he could
> defend himself, they failed to inform the public of the reason for Plaintiff's
> absence at the hearing, and failed to provide all of the relevant information at
> the hearing, including information that the Mayor had previously disavowed
> many of the allegations against Plaintiff.

(Id. ¶ 87.)

Defendants move for summary judgment on Plaintiff's civil conspiracy claim because Defendants are entitled to governmental immunity, and because "[t]here is . . . no evidence that the Defendants entered into an agreement or understanding among them[selves] to tort[i]ously interfere with Plaintiff's valid business expectancy, defame Plaintiff, or embarrass Plaintiff and deprive him of the public hearing he requested." (Def'ts.' Mem. Supp. Mot. Summ. J. at 19 [Doc. 24].) Defendants note that "[t]here is no evidence that Defendants took any action against Plaintiff except properly at official meetings of . . . Council." (Id.)

In response to Defendants' motion for summary judgment on this claim, Plaintiff argues that Defendants waived their governmental, or sovereign, immunity by purchasing insurance covering the claim. Plaintiff also counters that "there is more than enough evidence to support a reasonable inference of a conspiracy, making summary judgment improper" with respect to the civil conspiracy claim. (Pl.'s Mem. Opp'n Defs.' Mot. Summ. J. at 12.) Plaintiff does not cite to evidentiary materials available of record but urges

> [i]t is clear that . . . Montgomery began conspiring to terminate [Plaintiff] prior to [Montgomery's] election, and once elected, the other members of the Council, along with their attorneys, agreed to participate in the conspiracy and deny [Plaintiff] due process by refusing to set a mutually convenient date in order for [Plaintiff] to defend himself against the baseless charges against him.

(Id.)

"A 'civil conspiracy' is the agreement or understanding between two [or more] parties to commit an unlawful act, or to use unlawful means to carry out a lawful act." **State ex rel.**

**Missouri Highways and Transp. Comm'n**, 364 S.W.3d 695, 702 (Mo. Ct. App. 2012); see also **Oak Bluff Partners, Inc. v. Meyer**, 3 S.W.3d 777, 780-81 (Mo. 1999) (en banc) (per curiam).  More specifically, "[a] civil conspiracy consists of (1) two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful acts, and (5) damages as the proximate result thereof." **Edmonds v. Hough**, 344 S.W.3d 219, 225 (Mo. Ct. App. 2011).

Having found no genuine dispute of material fact and concluding Defendants are entitled to entry of judgment as a matter of law, Defendants' motion for summary judgment on the civil conspiracy claim in Count VI will be granted.  City, Council, and individual Defendants sued in their official capacities are entitled to sovereign immunity protection from Plaintiff's civil conspiracy tort claim to the same extent and for the same reasons as discussed in the resolution of the motion directed to Plaintiff's tortious interference claim in Count V.  Additionally, for the same reasons that applied to the resolution of Plaintiff's tortious interference claim, the individual defendants sued in their individual capacities are entitled to official immunity protection from Plaintiff's civil conspiracy claim.  Plaintiff has not, moreover, provided or pointed to evidentiary materials supporting his position that there was a meeting of the minds or that Defendants engaged in the alleged overt acts in furtherance of a conspiracy.

Accordingly, Defendants' motion for summary judgment on the civil conspiracy claim in Count VI will be granted.

42 U.S.C. § 1983 Claim for Violation of Plaintiff's Right to Substantive Due Process

(Count VII).  In Count VII, Plaintiff seeks relief under 42 U.S.C. § 1983 for Defendants' conduct in allegedly defaming Plaintiff and then depriving him of an opportunity to defend himself due to Defendants' refusal to continue the June 2011 hearing for three hours.  (Pl.'s Compl. ¶ 92 [Doc. 2].)  Plaintiff alleges that this conduct by Defendants shocks the conscience, was arbitrary and capricious, and offends judicial notions of fairness.  (Id.)  Plaintiff further alleges that Defendants' actions in suspending and terminating him were arbitrary and capricious.  (Id. ¶ 93.)  As a result, Plaintiff alleges, Defendants violated his rights to substantive due process under the Fifth and Fourteenth Amendments.  (Id. ¶ 94.)

Defendants move for summary judgment in their favor on this claim on the ground that Defendants' actions leading to Plaintiff's termination did not violate Plaintiff's right to due process and that Defendants are entitled to qualified immunity.

Focusing on a procedural due process claim only, Plaintiff counters that Defendants have conceded that Plaintiff has a valid property interest in continued employment and was entitled to due process before his termination.  Plaintiff further argues that Defendants are not entitled to qualified immunity because they did not provide a proper post-termination hearing.

For a claim under 42 U.S.C. § 1983, the plaintiff must show a deprivation of a federal constitutional or statutory right by one or more persons acting under color of state law. **Tipler v. Douglas Cnty., Neb.**, 482 F.3d 1023, 1027 (8th Cir. 2007).  Qualified immunity protects government officials who are performing discretionary functions from liability for civil damages to the extent their challenged conduct "does not violate clearly established

statutory or constitutional rights of which a reasonable person would have known," **Harlow v. Fitzgerald**, 457 U.S. 800, 818 (1982), only when the officials are sued in their individual capacities,[10] **Campbell v. State of Iowa, Third Judicial Dist. Dep't of Corr. Servs.**, 702 F.3d 1140, 1141 (8th Cir. 2013). Therefore, to resolve whether Plaintiff is entitled to relief under § 1983 and whether or not a Defendant is entitled to qualified immunity, the Court must ascertain whether Defendants' challenged conduct violated a clearly established constitutional right. After reviewing the record and the parties' positions, the Court finds there is no genuine dispute of material fact and Defendants are entitled to entry of summary judgment in their favor on the due process claim in Count VII.

Plaintiff alleges, for this claim, that Defendants' challenged conduct violated his federal constitutional right to due process. While Plaintiff alleges Defendants' challenged conduct violated the due process protections of both the Fifth and Fourteenth Amendments, there is no Fifth Amendment due process claim against non-federal government defendants, such as the defendants in this lawsuit. **Hess v. Ables**, 714 F.3d 1048, 1053 (8th Cir. 2013). Therefore, the summary judgment motion will be granted as to Plaintiff's Fifth Amendment

---

[10] Neither party addresses municipal liability for purposes of either of Plaintiff's § 1983 claims to the extent those claims are pursued against City, Council, or the individual Defendants in their official capacities. See **Hess v. Ables**, 714 F.3d 1048, 1054 (8th Cir. 2013). A municipality can only be liable under § 1983 if a municipal policy or custom is behind the constitutional violation. See, e.g., **Monell v. Department of Social Servs. of the City of New York**, 436 U.S. 658 (1978); **Hess**, 714 F.3d at 1054. Here, Plaintiff has not set forth any evidentiary material to support a determination that any of Defendants' challenged conduct in the two § 1983 claims arose out of City's policy or custom; or that a genuine dispute exists on this issue. Therefore, the summary judgment motion will be granted on these two claims to the extent they are pursued against City, Council, or the individual Defendants sued in their official capacities.

Due Process claim and this discussion will focus only on Plaintiff's claim that Defendants' challenged conduct violated the due process clause of the Fourteenth Amendment.

"The Due Process Clause of the Fourteenth Amendment prohibits governments from depriving 'any person of life, liberty, or property, without due process of law.'" **Creason v. City of Washington**, 435 F.3d 820, 824 (8th Cir. 2006) (quoting U.S. Const. amend. XIV, § 1). It has two components: procedural due process and substantive due process. <u>See</u> **County of Sacramento v. Lewis**, 523 U.S. 833, 840 (1998). Because Plaintiff pursues a substantive due process claim in his complaint, the Court will address this motion as directed against a substantive due process claim. To the extent the parties focus on procedural due process issues in their summary judgment materials, the Court will also address procedural due process issues.

A substantive due process violation requires proof that a government official's conduct was conscience-shocking and violated one or more fundamental rights arising under the Fourteenth Amendment. **Moran v. Clarke**, 296 F.3d 638, 642-48 (8th Cir. 2002) (en banc); <u>see</u> <u>also</u> **County of Sacramento**, 523 U.S. at 847 n. 8 (for such a challenge "the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience"). If the claim is resolved by consideration of the first prong, then the court does not need to resolve the second one. <u>See</u> **Ganley v. Minneapolis Park & Recreation Bd.**, 491 F.3d 743, 749 (8th Cir. 2007) (disposing of the substantive due process claim by finding the plaintiffs had not satisfied the first inquiry, "regardless of whether or not the [plaintiffs] possessed a right arising under the

Fourteenth Amendment").

To satisfy the first issue, a plaintiff must show that the government acted in a way that shocks the conscience. **Satcher v. University of Ark. at Pine Bluff Bd. of Trs.**, 558 F.3d 731, 736 (8th Cir. 2009). More specifically, for a substantive due process claim, a "government's actions [must] 'either shock the conscience' or 'offend judicial notions of fairness or human dignity,'" which requires a showing that the government's conduct was more than "'arbitrary, capricious, or a violation of state law.'" **Young v. City of St. Charles, Mo.**, 244 F.3d 623, 628 (8th Cir. 2001) (first quoting <u>Riley v. St. Louis Cnty.</u>, 153 F.3d 627, 631 (8th Cir. 1998) and then quoting <u>Weiler v. Purkett</u>, 137 F.3d 1047, 1051 (8th Cir. 1998) (en banc)). Conscience-shocking conduct is official conduct "intended to injure in some way unjustifiable by any government interest." **Moran**, 296 F.3d at 647 (internal quotation marks omitted) (quoting <u>County of Sacramento</u>, 523 U.S. at 849). "Whether conduct shocks the conscience is a question of law." **Folkerts v. City of Waverly, Iowa**, 707 F.3d 975, 980 (8th Cir. 2013).

Here the undisputed record discloses that certain actions by Plaintiff in his role as City Administrator were challenged by Montgomery, both before and after he became a member of City Council in April 2011; and Plaintiff was subsequently suspended and then terminated by Defendants, after Plaintiff received notice of Defendants' concerns, an opportunity to respond to those concerns, and an opportunity to appear before Council at a public hearing. The concerns pertained, in part, to Plaintiff's failure to comply with City's bidding requirements for projects costing a certain amount of money and to Plaintiff's

announcement of a change in City employees' annual sick leave bonus before such a change was officially authorized. Nothing in the undisputed record regarding Plaintiff's termination, including his suspension and Defendants' denial of his request for a continuance of the hearing scheduled for June 2011, shocks the conscience or offends judicial notions of fairness or human dignity. See, e.g., **Costello v. Mitchell Pub. Sch. Dist. 79**, 266 F.3d 916, 921 (8th Cir. 2001) (affirming the grant of summary judgment in favor of the defendants upon concluding there was no genuine issue of material fact as to whether band teacher's harassing behavior toward the plaintiff student, which included calling the student "stupid," "retarded," and "dumb" in front of her classmates and, on one occasion, hitting her in the face with a notebook he had thrown, was sufficiently shocking for a substantive due process claim); see also **Young**, 244 F.3d at 628 (affirming the dismissal of the plaintiff's complaint upon concluding that a city police officer's discharge for altering documents was not sufficiently outrageous to support a substantive due process claim).

The Court also finds that any procedural due process claim pursued by Plaintiff is without merit. For a procedural due process claim, Plaintiff must demonstrate that he has a protected property or liberty interest and he was deprived of that interest without due process of law. **Marler v. Missouri State Bd. of Optometry**, 102 F.3d 1453, 1456 (8th Cir. 1996). A public employee has a protected liberty interest that may be violated when the employee is terminated in connection with publicized allegations of dishonesty, immorality, or illegality. **Hammer**, 318 F.3d at 839-40 (citing Board of Regents v. Roth, 408 U.S. 564, 573 (1972)). To the extent Plaintiff should not be considered an at-will employee who could

-52-

be terminated at any time for any reason, he may also have had a property interest in his continued employment.  See, e.g., **id.** at 839 n.11; accord **Cleveland Bd. of Educ. v. Loudermill**, 470 U.S. 532, 538 (1985) (a public employee who has a property interest in continued employment may not be deprived of that employment without due process).  In either circumstance, Plaintiff is entitled to adequate notice and a hearing.  See **Hammer**, 318 F.3d at 839-40 (due process requires that an employee discharged with publicized allegations of improper or illegal conduct have adequate notice and an opportunity to dispute the charges in a name-clearing hearing); **Young,** 244 F.3d at 627 (a public employee entitled to a hearing before being deprived of a constitutionally protected property interest "receives sufficient due process if he receives notice, an opportunity to respond to the charges before his termination, and post-termination administrative review").

"The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" **Wooten v. Pleasant Hope R-VI Sch. Dist.**, 270 F.3d 549, 551 (8th Cir. 2001) (quoting Mathews v. Eldridge, 424 U.S. 319, 333 (1976)).  "The nature of this constitutional guarantee is flexible . . . and varies with the particular situation."  **Id.** (citing Gilbert v. Homar, 520 U.S. 924 (1997)).  Here, Plaintiff received notice and an opportunity to be heard at a meaningful time in a meaningful manner.  Plaintiff was advised of concerns about his work for the City and was provided an opportunity to respond, either in person or in writing, to those concerns.  Plaintiff then responded in writing to those concerns, and subsequently learned that Council had voted to terminate him.  Thereafter, Plaintiff exercised his right to request a public hearing and received notice, about

one month before the hearing, of the hearing date and time.  Approximately three weeks before the hearing, Plaintiff's request for a three-hour continuance of that hearing was denied. After the hearing, Council entered a written Decision setting forth the facts and principles supporting its decision.  This record discloses that Plaintiff was provided with both reasonable notice and an opportunity to be heard at a meaningful time in a meaningful manner.

While Defendants denied Plaintiff's request for a three-hour continuance of that hearing, nothing of record indicates either that the basis for that continuance request was conveyed when the request was made or that the denial of the continuance adversely affected Plaintiff's ability to attend the hearing as scheduled.  The hearing was scheduled for a reasonable time during the early afternoon of a weekday.  Plaintiff and his attorney received approximately one month's notice of that hearing.  Nothing of record[11] indicates that the continuance request was based on a reason that might necessitate a continuance, such as perhaps a medical need of Plaintiff or his counsel, rather than another reason, such as convenience or a scheduling conflict, which might support but would not necessarily require a continuance.  Nothing of record indicates that any conflict Plaintiff or his counsel had with the hearing date and time was unavoidable.

Without more, it is not clear that Plaintiff's right to procedural due process was

---

[11]  Plaintiff has provided in this record a copy of a notice of deposition in another lawsuit that Plaintiff's counsel scheduled for June 27, 2011 at 10:00 a.m. at Plaintiff's counsel's office, see Ex. G attached to Pl.'s Statem. Facts [Doc. 25-7], and a copy of one page of the docket sheet, presumably for that lawsuit, see Ex. H attached to Pl.'s Statem. Facts [Doc. 25-8].  These materials are not supported by an affidavit or other evidentiary material; and will not be considered by this Court.

violated by a failure to reschedule a hearing set at a reasonable time, for which Plaintiff received reasonable pre-hearing notice, and for which arrangements by numerous Council members and witnesses, in addition to Mayor, a court reporter, and other counsel, would have to be altered. <u>See</u>, <u>e.g.</u>, Cage Dep., Defts' Ex. E, at 126. Moreover, nothing of record indicates that at the time of the hearing either Plaintiff or his counsel were physically or otherwise unable to attend the hearing. Under the circumstances, Plaintiff received due process through the hearing scheduled by Council and conducted as scheduled, despite Plaintiff's absence. While a better practice would be to confer with the discharged employee or the employee's attorney before the scheduling of the hearing to ascertain several mutually agreeable times for the hearing, this Court cannot conclude that the manner in which Plaintiff's hearing was scheduled violated due process. Any other result would put governmental entities in the untenable situation of having to comply with due process hearing requirements only by conducting such hearings at times requested by the terminated employee. That is not required by due process principles.

Plaintiff relies on **Rush v. Perryman**, 579 F.3d 908 (8th Cir. 2009), to support his position that summary judgment should not be entered in favor of Defendants on this claim. That case is inapposite. In **Rush**, the United States Court of Appeals for the Eighth Circuit found that the district court properly denied summary judgment when an employee accused of dishonesty did not receive a hearing at a meaningful time in that the hearing occurred before the stigmatizing statements were made and the employee's subsequent request for a hearing was denied. **Id.** at 914. To the contrary, here, Defendants granted Plaintiff's request

for a public hearing and conducted such a hearing; and the hearing was held after the allegedly stigmatizing statements were made.

Upon careful consideration, the Court concludes that no genuine dispute of material fact exists with respect to Plaintiff's due process claim in Count VII of the complaint, and that Defendants are entitled to entry of summary judgment in their favor on that claim.

Conspiracy Claim under 42 U.S.C. § 1983 (Count VIII).  For his conspiracy claim in Count VIII, Plaintiff alleges that, under 42 U.S.C. § 1983, the individual Defendants are liable for conspiring to suspend and fire Plaintiff and then falsely accuse him of being dishonest, a liar, and a thief.  To further the conspiracy, these Defendants allegedly falsely and publicly accused Plaintiff of being a liar and a thief, refused to provide Plaintiff with access to documents to defend himself, refused to continue the hearing for three hours, conducted that hearing in Plaintiff's absence, and did not explain to the public that Plaintiff had advised that he could not attend the hearing and had requested a continuance.

Individual Defendants move for entry of summary judgment in their favor because it is undisputed that Plaintiff is not aware of anyone conspiring against him, see Defs.' Statem. Facts ¶¶ 101 and 102 [Doc. 23], as admitted by Pl. [Doc. 25]; and there is no evidence that any individual Defendant acted improperly or outside their official duties, or acted to deprive Plaintiff of a constitutional right.  Plaintiff responds that he need only show a reasonable inference of a conspiracy and, without citing to any evidentiary material available of record, urges

[i]t is clear that . . . Montgomery began conspiring to terminate [Plaintiff] prior

to [Montgomery's] election, and once elected, the other members of the Council, along with their attorneys, agreed to participate in the conspiracy and deny [Plaintiff] due process by refusing to set a mutually convenient date in order for [Plaintiff] to defend himself against the baseless charges against him.

(Pl.'s Mem. Opp'n Defs.' Mot. Summ. J. at 14.)

To establish a § 1983 conspiracy claim, a plaintiff must show "(1) that the defendant conspired with others to deprive him of constitutional rights; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; . . . (3) that the overt act injured the plaintiff . . . [and (4)] that he was deprived of a constitutional right."

**White v. McKinley**, 519 F.3d 806, 814 (8th Cir. 2008). In particular, Plaintiff

must show evidence sufficient to support the conclusion that the defendants reached an agreement to deprive the plaintiff of constitutionally guaranteed rights. Larson by Larson v. Miller, 76 F.3d 1446, 1458 (8th Cir. 1996). "The question of the existence of a conspiracy to deprive [a plaintiff] of [his] constitutional rights should not be taken from the jury if there is a possibility the jury could infer from the circumstances a 'meeting of the minds' or understanding among the conspirators to achieve the conspiracy's aims." Id. Because "the elements of a conspiracy are rarely established through means other than circumstantial evidence, and summary judgment is only warranted when the evidence is so one-sided as to leave no room for any reasonable difference of opinion as to how the case should be decided. The court must be convinced that the evidence presented is insufficient to support any reasonable inference of a conspiracy." Westborough Mall, Inc. v. City of Cape Girardeau, 693 F.2d 733, 743 (8th Cir. 1982).

**Id.** at 816.

Based on the available record, especially Plaintiff's agreement that no one conspired against him, the Court is convinced the evidence is insufficient to support any reasonable inference of a conspiracy. There is no possibility a jury could infer a meeting of the minds occurred among the alleged conspirators based on the available record. Accordingly, the

motion for summary judgment will be granted as to the § 1983 conspiracy claim in Count VIII.

Missouri Sunshine Law (Count IX). In Count IX, Plaintiff alleges all Defendants purposely or knowingly violated Missouri's Sunshine Law in that Mayor publicly announced the decision to discharge Plaintiff between 9:00 p.m. and 9:30 p.m. on May 4, 2011, and City did not notify him of his termination before that announcement but instead, Plaintiff "first learned of his discharge through a publicly broadcasted radio show the next morning." (Pl.'s Compl. ¶¶ 110, 113 [Doc. 2].) Defendants seek entry of summary judgment in their favor on this claim on the grounds that notice of Plaintiff's discharge was sent to his attorney just after the decision was made, and the attorney advised Plaintiff of his termination. Plaintiff responds that, while he agrees that Defendants' counsel sent Plaintiff's counsel, at 9:36 p.m. on May 4, 2011, an e-mail stating that Defendants had voted to discharge Plaintiff, such notice of the decision did not satisfy Missouri's Sunshine Law requirements because Defendants did not make sure notice was received by Plaintiff.

Missouri's Open Meetings and Records Act ("Missouri's Sunshine Law") states "[i]t is the public policy of this state that meetings, records, votes, actions, and deliberations of public governmental bodies be open to the public unless otherwise provided by law." Mo. Rev. Stat. § 610.011.1. To promote this policy, Sections 610.010 to 610.200 of the Sunshine Law are to be liberally construed, while their exceptions are to be strictly construed. Mo. Rev. Stat. § 610.011.1; see also **Great Rivers Envtl. Law Ctr. v. City of St. Peters**, 290 S.W.3d 732, 733-34 (Mo. Ct. App. 2009). A person or governmental body

found to have knowingly violated a provision of Missouri's Sunshine Law will be liable for a civil penalty up to $1,000 and may be liable for the successful party's costs and reasonable attorney's fees. Mo. Rev. Stat. § 610.027.3. A person or governmental body found to have purposefully violated a provision of Missouri's Sunshine Law will be liable for a civil penalty up to $5,000, plus the successful party's costs and reasonable attorney's fees. Mo. Rev. Stat. § 610.027.4. The civil fine and attorney's fees provisions are narrowly construed because they are penal in nature. **Spradlin v. City of Fulton**, 982 S.W.2d 255, 261-62 (Mo. 1998) (en banc).

The statutory provision at issue now is the provision requiring notice to the public employee, before notice to the public, of a decision to discharge that employee. Mo. Rev. Stat. § 610.021(3). Specifically, the relevant provision states:

> any vote on a final decision, when taken by a public governmental body, to hire, fire, promote or discipline an employee of a public governmental body shall be made available with a record of how each member voted to the public within seventy-two hours of the close of the meeting where such action occurs; provided, however, that any employee so affected shall be entitled to prompt notice of such decision during the seventy-two-hour period before such decision is made available to the public.

**Id.** (emphasis added). The statute does not define notice or describe the manner by which notice is to be provided. This statutory provision, however, clearly requires "prompt notice" of the decision to the affected employee before the information is made available to the public.

Assuming notice by e-mail to Plaintiff's attorney was proper, the issue is whether or not that notice occurred before notice of Plaintiff's discharge was provided to the public.

The parties do not dispute that the e-mail was sent at 9:36 p.m. on May 4, 2011, and that Mayor's public announcement of Plaintiff's discharge occurred around 9:30 p.m. that evening. (See, e.g., Letter, dated May 6, 2011, from Breeze to Pl.'s Counsel, Ex. 6 admitted in the June 27, 2011 hearing, attached to Ex. A of exhibits attached to Defs.' Statem. Facts [Doc. 23-2 at 34-35].)

Other evidentiary materials available of record addressing this notice issue are excerpts of the deposition testimony of Plaintiff, Mayor, and Montgomery. Plaintiff testified that, through his attorney, he understood that he was discharged; and he did not hear it from any other source. (Draper Dep., Ex. C attached to Defs.' Statem. Facts, at 60, 182, 184 [Doc. 23-5 at 12, 60, 62].) Mayor testified that he did "not know" if Plaintiff was informed of his termination before the public was notified, but he knew, from City's attorney, that City's attorney notified Plaintiff through his attorney. (Cage Dep., Ex. E attached to Defs.' Statem. Facts, at 114-15 [Doc. 23-7 at 21-22]; Cage Dep., Ex. A attached to Pl.'s Oppos. Defs.' Mot. Summ. J., at 26, 60 [Doc. 25-1 at 5, 11].) Mayor further stated that the public was informed of Plaintiff's termination that evening after the executive session, and he did not know how long that executive session lasted. **Id.** at 115. Montgomery testified that Plaintiff's discharge was publicly announced around 9:30 p.m. on May 4, 2011, and he did not know if Plaintiff was notified of his discharge before that announcement. (Montgomery Dep., Pl.'s Ex. B attached to Pl.'s Oppos. Defs.' Mot. Summ. J., at 219-20 [Doc. 25-2].) Additionally, a letter, dated May 6, 2011, from Breeze to Plaintiff's attorney states that Mayor's announcement of Plaintiff's discharge occurred "[a]fter the vote was made [in closed executive session, when

the meeting was opened to the public and i]n the open meeting, Mayor . . . stated that [Plaintiff] was no longer employed by the City. . . . This announcement was made at roughly 9:30 p.m."

Because it appears from the undisputed record that the public announcement of Plaintiff's discharge occurred before Plaintiff was notified,[12] Defendants are not entitled to entry of judgment as a matter of law on the Sunshine Law violation claim in Count IX; and Defendants' motion for summary judgment as to that claim will be denied.

### Conclusion

Having found genuine disputes of material fact exist or Defendants are not entitled as a matter of law to entry of judgment in their favor on Plaintiff's defamation claim (Count IV) and Plaintiff's Sunshine Law violation claim (Count IX), the Court will deny Defendants' motion for summary judgment on those claims. In all other respects, Defendants' motion for summary judgment will be granted. Plaintiff's defamation claim against the individual Defendants (Count IV) and Plaintiff's Sunshine Law violation claim (Count IX) against all Defendants remain scheduled for jury trial on December 9, 2013.

After careful consideration,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment [Doc. 22] is **GRANTED** with respect to the claims in Counts I, II, III, V, VI, VII, and VIII of

---

[12] Neither party addresses in their summary judgment briefs or materials the requirement that a Sunshine Law violation be "knowing" or "purposeful" to warrant relief; therefore, the Court does not address that issue.

Plaintiff's complaint.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment [Doc. 22] is **DENIED** with respect to Plaintiff's defamation claim (Count IV) and Missouri Sunshine Law violation claim (Count IX).

**IT IS FINALLY ORDERED** that this case is scheduled for a final pretrial conference at **9:30 a.m.** on **Thursday, December 5, 2013**.


/s/ Thomas C. Mummert, III
**THOMAS C. MUMMERT, III**
**UNITED STATES MAGISTRATE JUDGE**

Dated this 15th day of October, 2013.